**In the Matter of Charles W. RASCHKE and Elizabeth M. Raschke, Debtors.**

**Bankruptcy No. MM13–83–01923.**

United States Bankruptcy Court,
W.D. Wisconsin.

June 13, 1984.

---

\*    \*    \*    \*    \*    \*

Denis Bartel, Ross & Stevens, S.C., Madison, Wis., for debtors.

Thomas Landowski, Collins, Beatty & Krekeler, Madison, Wis., for creditor Mathilda Gregerson.

William A. Chatterton, Ross & Chatterton, Madison, Wis., trustee.

## OPINION AND ORDER FOR CONFIRMATION

ROBERT D. MARTIN, Bankruptcy Judge.

This case is before the court on an objection to confirmation and motion to dismiss filed by Mrs. Mathilda Gregerson. Mrs. Gregerson contends that the plan was not proposed in good faith and does not afford her the treatment required by 11 U.S.C.

§ 1325(a)(5) in that it fails to recognize her claim for an equitable lien or a constructive trust in her favor by virtue of the debtors' wrongful taking of her money and property. The facts of the case demonstrate a painful story of affection, need, generosity, confused communication, and ultimately recrimination which was put before the court in long hours of sometimes emotional testimony.

Mrs. Gregerson, who is 78 years old and suffering from ailments which now confine her to a wheelchair, has been acquainted with the debtors for about 25 years. During that time the Raschkes had driven taxis which Mr. and Mrs. Gregerson used as a primary means of transportation. Following Mr. Gregerson's death in 1973 the Raschkes, particularly Mr. Raschke, provided additional assistance to Mrs. Gregerson. Mr. Raschke aided her with complete fidelity in carrying out banking errands. After Mrs. Gregerson had knee surgery in July 1980, the Raschkes looked in on Mrs. Gregerson daily and brought her meals as a part of the "meals on wheels" program. A close relationship and genuine affection grew. Mrs. Gregerson noted the importance to elderly citizens of the taxicab service which the Raschkes provided in Baraboo and appreciated the friendly concern demonstrated by the Raschkes personally.

In 1979 Mr. Raschke mentioned to Mrs. Gregerson that he wished to have a garage for the taxi business but could not obtain financing. Thereafter Mrs. Gregerson made money available to Mr. Raschke for the purpose of building a garage. Both the amount of money and the terms under which it was made available are disputed. Mrs. Gregerson states that she initially consented to Mr. Raschke's request to borrow $5,000.00 for the garage upon his agreement to repay the money in one year's time. Mr. Raschke states that Mrs. Gregerson told him she was making a gift which she wanted revealed to no one. But Mr. Raschke recalls insisting he would repay the sums advanced. Mrs. Gregerson testified that an additional term of the loan was that Mr. Raschke would "look after

her." Mrs. Gregerson transferred approximately $7,000.00 to Mr. Raschke during the time that the garage was being built. Following those transfers Mr. Raschke offered free taxi service to Mrs. Gregerson which she declined, insisting on paying for each ride. Other transfers to Mr. Raschke from Mrs. Gregerson for the taxi business occurred after the completion of the garage. Mr. Raschke now acknowledges these transfers to be loans which he agreed to repay.

Mrs. Gregerson had regular income from her husband's railroad retirement fund, and maintained a savings account which in June 1979 had a balance of $30,993.55. After the transfers to Mr. Raschke for building the garage and for assistance in the business the savings account balance had declined to $24,382.88. In the year following the completion of the garage Mrs. Gregerson had somewhat declining health and required medical attention including *inter alia* knee surgery in July 1980. Following that knee surgery the relationship between the Raschkes and Mrs. Gregerson became even warmer as they demonstrated concern for her welfare and she a concern for their business and persons.

Mrs. Gregerson became convinced that her health would be improved by a move to a warmer, dryer climate. Over a course of months plans were made for the Raschkes to move with Mrs. Gregerson to California. California was selected in preference to Arizona on the basis that Mr. Raschke's son assured Mr. Raschke of employment in San Jose. Before leaving Wisconsin for California in 1981 Mrs. Gregerson directed Mr. Raschke to purchase a car for the travel. Mr. Raschke found a suitable 1974 Mercury which was purchased with $2,200.00 of Mrs. Gregerson's money and titled in Mr. Raschke's name. Mrs. Gregerson claims that she lent the money to Raschke for the car purchase but he claims that the car was at all times Mrs. Gregerson's and the title in his name was at her insistence and only for convenience since Mrs. Gregerson did not drive. As another preparation for departure to California, $5,000.00 from Mrs. Gregerson's savings account was used to pay off the remaining debt on the Raschke's taxis. The Raschkes were transferring the taxi business and the autos to their daughter and son-in-law and it was desired by all that the new owners have a fresh start in that business free of the car debts.

Upon arrival in California Mr. Raschke took a good job and the three set up a single household where Mr. Raschke paid most rent and utility charges and Mrs. Gregerson made some payments toward food. Mrs. Gregerson did make substantial contributions to the household by purchasing furniture, kitchen appliances, a washing machine, dryer and power mower. Mr. Raschke understood those purchases to be gifts to Mrs. Raschke. Mrs. Gregerson was unsure whether the furniture and appliances were gifts but indicated she had intended the power mower to be a gift to Mr. Raschke. During the period of the residency in California Mrs. Gregerson acknowledges that she made an outright gift of some $500.00 to Mr. Raschke's son Jack when he was at their residence. She declined to elaborate on the gift saying that the transaction was with Jack alone, that it was intended to be a gift and that she seeks no recovery for it.

By all accounts the three lived as a family in California. The single rift during that time arose, according to Mrs. Gregerson, when she first requested repayment in June or July of 1981 and Mr. Raschke angrily denied that he had ever borrowed money from her. In emotional testimony Mrs. Gregerson testified to having been frightened by Mr. Raschke's profane response. However, there is no testimony that the Raschke's treatment of Mrs. Gregerson was materially changed by the incident. Mr. Raschke recalls no such incident.

In August 1981 Mrs. Gregerson's health had deteriorated and she decided to return to Baraboo to seek medical attention from doctors she preferred. Mr. and Mrs. Raschke accompanied her and set up a joint household in Baraboo. Total moving ex-

penses for the three of about $4,000.00 were paid by Mrs. Gregerson and their recovery is not sought. Mr. Raschke who was unable to find a job in Baraboo soon returned to California to resume his former work but Mrs. Raschke remained in Baraboo with Mrs. Gregerson. Mrs. Gregerson's health continued to be a problem and she was hospitalized for a few weeks in the fall of 1981. Mrs. Raschke looked after Mrs. Gregerson both before and after her hospitalization. However, Mrs. Gregerson soon decided that she should enter a nursing home. Mrs. Raschke assisted Mrs. Gregerson in preparations for transfer to the nursing home but after the transfer she promptly rejoined her husband in California.

At the time of her entry into the nursing home Mrs. Gregerson's savings account was essentially depleted. Mrs. Gregerson had left many possessions with Mrs. Raschke at the house in Baraboo but was too sick at the time to have a present recollection of what was said concerning the disposition of her possessions. Mrs. Raschke testified that those possessions were sold for little money, given to Mrs. Gregerson's relatives and charities or disposed of according to Mrs. Gregerson's instructions. Mrs. Gregerson estimates that the material value of those possessions was $9,000.00 calculated on replacement cost and not allowing for their sentimental value.

After Mrs. Gregerson went to the nursing home the Raschkes never wrote or visited her. All communication between Mrs. Gregerson and the Raschkes stopped and the parties had not seen each other from that time until the trial in this case. While in the nursing home Mrs. Gregerson received a new diagnosis of her illness, obtained treatment, and enjoyed considerable remission of symptoms and improved health. She was able to leave the nursing home and establish semi-independent residence. In May of 1983 she brought an action in Wisconsin state court to recover monies and property which she alleges to have been wrongly taken from her by the Raschkes during the previous four years.

Although Mr. Raschke's testimony has been inconsistent in some significant respects he does admit borrowing a total of $11,000.00 from Mrs. Gregerson, sums he accepted with a promise and intention to repay. In May or June of 1983 Mr. and Mrs. Raschke prepared bankruptcy statements and schedules on the advice and with the assistance of an attorney in San Jose, California. The petition and schedules in this case were thereafter filed on July 22, 1983. During this period Mr. Raschke discovered that his son-in-law's ill health prevented him from carrying on the taxicab business. Within a week after filing their petition the debtors returned to Baraboo, Wisconsin where they accepted a return of the taxicab business from their daughter and son-in-law for a nominal sum and resumed operation of that business. The bankruptcy papers included a chapter 13 plan which called for payments from the debtors' California earnings and a statement which indicated that the Raschkes had not been in business in the prior three years. A § 341 meeting of creditors was held in California in October of 1983 at which Mr. Raschke made a complete explanation of his prior business and of his subsequent return to Wisconsin. It does appear, however, that he failed to disclose to the trustee at that meeting that he had received pre-petition vacation pay from his California employer which was used in his moving back to Wisconsin. He also failed to advise the trustee of his reacquisition of the taxicab company.

Mrs. Gregerson's motion to transfer venue of the chapter 13 case to this district was granted on November 16, 1983. An additional § 341 meeting was held in Wisconsin on January 3, 1984. Amended schedules and plan were filed on January 5 and January 11, 1984.

The issues before us now are these:

1. Is Mathilda Gregerson entitled to benefit from either a "constructive trust" or an equitable lien impressed upon the proceeds of the money and other property

she transferred to the Raschkes, and if so, to what value?

2. Are the Raschkes entitled to confirmation of their chapter 13 plan over Mrs. Gregerson's objections?

(a) Does the plan meet a "best interests of creditors" test by providing for a greater distribution to creditors than they would receive on liquidation?

(b) Do the debtor's misstatements and contradictions at various hearings and depositions demonstrate a lack of good faith so as to preclude confirmation of their chapter 13 plan?

I

■ Constructive trusts and equitable liens are devices fashioned by courts of equity to redress certain classes of wrongs. Although the two remedies are generally similar in effect, a constructive trust arises from a property owner's wrongdoing and may call for a sale and distribution of proceeds of the corpus, while an equitable lien, which has less reliance upon wrongdoing, is imposed to prevent unjust enrichment and usually does not require immediate sale of the encumbered property. 51 Am. Jur.2d, *Liens*, § 3 (1970). The effect of the court's finding that property held by the Raschkes is subject to a trust would be to exclude Mrs. Gregerson's equitable interest in the property from the bankruptcy estate. 11 U.S.C. § 541(d).[1] The imposition of an equitable lien, on the other hand, would vouchsafe Mrs. Gregerson "adequate protection" of her interest in the property, and require payment to her of the value of her interest over the period of debtors' chapter 13 plan, unless she agrees to different treatment or accepts surrender of the property. 11 U.S.C. § 1325(a)(5).

A number of Wisconsin decisions have considered demands for the impressment or imposition of these two equitable remedies. In *Masino v. Sechrest*, 268 Wis. 101, 66 N.W.2d 740 (1954), which involved a daughter's failure to perform her promise to her late mother that she would hold conveyed real estate for the benefit of her siblings, the Wisconsin Supreme Court said

The underlying principle of a constructive trust is the equitable prevention of unjust enrichment which arises from fraud or the abuse of a confidential relationship.

268 Wis. at 107, 66 N.W.2d 740. "It is not the promise only, or the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion." *Id.* at 110, 66 N.W.2d 740, citing *Sinclair v. Purdy*, 235 N.Y. 245, 253, 139 N.E. 255.

Nearly all the reported Wisconsin decisions approving constructive trusts arise from some form of family settlement. The exception(s) arise from fraud added to some measure of confidence. Thus, in *Nehls v. Meyer*, 7 Wis.2d 37, 95 N.W.2d 780 (1959), a mother had given her son a warranty deed to certain property, which the son later deeded to his sister. In an ejectment action brought by the sister, the son alleged that the deed to him was delivered on an oral promise to hold the property in trust for his mother, the grantor, and that when the son contemplated entering military service, the mother directed him to convey the property to his sister on the same terms. He further alleged that the daughter's refusal to perform the agreement abused a confidential relationship among herself and her mother and brother. Citing several decisions from other states which found constructive trusts of real estate in family settlement situations, and relying largely on *Masino, supra*, the court reversed and remanded for consideration of further evidence which the trial court had

---

**1.** 11 U.S.C. § 541(d) provides:

Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or super-vise the servicing of such mortgage or interest, becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

not admitted. 7 Wis.2d at 43, 95 N.W.2d 780.

A constructive trust, arising from a confidential relationship between brothers, was alleged in *Gorski v. Gorski*, 82 Wis.2d 248, 262 N.W.2d 120 (1978). One brother had agreed to allow another brother to manage and invest his income and pay his (the trustor's) living expenses. On appeal from the trial court's dismissal the court held that the amended complaint did state a cause of action for constructive trust, which must involve "fraud, duress, abuse of confidence, mistake ... [or] ... unconscionable conduct." 82 Wis.2d at 255, 262 N.W.2d 120. *Cf. Joerres v. Koscielniak*, 13 Wis.2d 242, 247, 108 N.W.2d 569 (1961) (oral promise by trusted friend to reconvey real estate transferred to avoid foreclosure).

■ Applying these principles to the transactions between Mrs. Gregerson and the Raschkes, it cannot be said that the Raschkes' actions rise to the level of fraud or unconscionability required to raise a constructive trust upon the money or property given them by Mrs. Gregerson. In reaching this conclusion, the court intends no lack of sympathy for Mrs. Gregerson, whose financial situation and poor health alone merit great compassion. But on the facts shown, Mrs. Gregerson had no legal family relationship with the Raschkes. They did not exploit her dependence on them for transportation or companionship to produce a coercive effect. The testimony shows that she made substantial transfers to the Raschkes out of genuine generosity. Some were undoubtedly gifts, others were clearly loans which Mr. Raschke intended to repay, and still others were so ambiguous that the understanding of both the transferor and the transferee is truely doubtful. The Raschkes may well have hoped that they would not be called upon to repay most or all of what they received, but there is no evidence that either of them fraudulently misrepresented an actual intention to repay in order to induce Mrs. Gregerson to make the transfers. It cannot be doubted that the Raschkes sincerely

believed Mrs. Gregerson to be an extremely generous woman, nor that they directly benefitted from and at least partially came to rely upon that generosity. However, there is no evidence that either of them at any time knowingly or recklessly misrepresented by words or action facts on which Mrs. Gregerson relied in transferring monies to them. There is no evidence that the transfers were demanded as a condition for either friendship or care. Nor is there evidence of any other unconscionable or coercive manipulation of the relationship which apparently gave rise to the generosity.

Of particular note is the stated or implied agreement to care for Mrs. Gregerson. This duty, whether created by agreement or by social responsibility based on love shared by these people, was scrupulously carried out by the Raschkes, even after the point at which Mrs. Gregerson could not provide further financial help, until Mrs. Gregerson decided they could not provide adequate care. It is a shame that communications between them broke down thereafter, and that the Raschkes did not celebrate with Mrs. Gregerson her return to relative good health, but there is no basis for finding that the Raschkes shirked in any way their obligation to care for Mrs. Gregerson. There has been no credible evidence that the Raschke's intentions toward Mrs. Gregerson were in any relevant way impermissibly exploitive. Nor is there credible evidence that their actions were unconscionable. Without such evidence there is no basis for the imposition of a constructive trust.

■ For the court to impose an equitable lien on property, it must be convinced of the existence of a debt, a *res*, and an "intent ... that the property serve as security for the payment of the debt or obligation." 51 Am.Jur.2d, *Liens*, § 24 (1970). "It is insufficient to show a mere breach of contract, a failure to repay money as agreed, or a failure to pay an indebtedness." *Id.* (footnotes omitted). When Mrs. Gregerson gave Mr. Raschke the money for the garage, she apparently intended it as a gift.

**188**

Mr. Raschke may well have intended to repay the money advanced, an intention he has not performed. Without condoning such failure, the court cannot say that equity or good conscience is shocked. Rather, this lengthy controversy appears to be based on an exquisite network of hopes, needs, and disillusion. The court has been presented with a nebulous, but simple case of at most an unpaid debt, based on an oral promise and lacking any intended security. The fact that some of the money transferred was intended to be used to build a garage is not to say that a debt created by the transfer was intended to be secured by the garage. Thus, at least one essential element of an equitable lien is lacking.

## II

■ The Bankruptcy Code requires that a debtor's chapter 13 plan provide for payment on unsecured claims of property whose value as of the effective date of the plan "is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1325(a)(4). A plan providing for lesser payment may not be confirmed over the objection of the affected creditor. It is necessary, therefore, to compare what Mrs. Gregerson would receive in a liquidation case to the amount the debtors propose to pay her through their plan.

The principal asset of the estate is the Raschkes' residence. The court heard extensive testimony from three appraisers and concludes that the fair market value of this property is $56,000.00. The property is subject to a mortgage in the amount of $39,000.00, leaving a potential equity of $17,000.00 for the debtors. According to their schedules other assets of the debtors total $7,600.00 in value.

Assuming that the debtors would make maximum use of their homestead exemptions under 11 U.S.C. § 522(d)(1) and adjusting for certain items claimed by the debtors under the "wild-card" provision of 11 U.S.C. § 522(d)(5), the Raschkes could exempt property worth $18,750.00, leaving

$5,850.00 for their creditors. Allowed priority claims of $4,000.00 in administrative expenses and $2,500.00 in taxes exceed this sum. See 11 U.S.C. § 507(a). Therefore Mrs. Gregerson would receive nothing in a chapter 7 liquidation of these debtors. Since under the debtors' plan Mrs. Gregerson would receive some return on her claim, however small, the Raschkes' plan plainly meets the "best interest of creditors" test of § 1325(a)(4).

The good faith shown by the debtors, in light of Mr. Raschke's various misstatements and self-contradictions is a more difficult question. Counsel for Mrs. Gregerson has pointed out several particular problems:

(1) the removal of the Raschkes to Wisconsin directly after their bankruptcy filing in California in July 1983;

(2) the debtors' first chapter 13 plan, which anticipated payment from their California earnings;

(3) the debtors' first schedules which inaccurately stated that they had not been in business during the prior three years; and

(4) Mr. Raschke's failure to disclose either his accrued California vacation pay or his reacquisition of the Baraboo taxicab business at the creditors' meeting he attended in California.

A court must insist on the utmost honesty from all who appear before it. But a court must be no less sensitive to the personalities and idiosyncrasies of communication of parties and witnesses if it is to understand their statements and do justice under law. After skilled examination and cross-examination of this debtor by both counsel, the court concludes that in light of Mr. Raschke's own personal history, business experience, and habits of speech, he has not fundamentally failed in his duty of truthfulness. At the time of the bankruptcy filing in California, venue was proper in the district where the petition was filed. 28 U.S.C. § 1472(1). The various lists and schedules were prepared with the aid of California counsel more than a month before the petition was actually filed. While

the Raschkes' failure to correct their schedules promptly was ill-advised and censurable, any harm to creditors was obviated by the fuller disclosures at the October 1983 § 341 meeting. The inaccuracy as to Mr. Raschke having been in business within the prior three years was minimal and not prejudicial: he had left the business about two and one-half years before filing. The vacation pay should have been scheduled in the first filing, but Mr. Raschke would not be the first debtor (or lawyer) uncertain about whether an accrued but unpaid benefit belonged to his bankruptcy estate. *See, e.g. Lines v. Frederick*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970) (Act case). *Kokoszka v. Belford*, 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) (Act case); *Cf. In Re Doan*, 672 F.2d 831 (11th Cir.1982); *In Re Haynes*, 679 F.2d 718 (7th Cir.1982). Finally, the terms of Mr. Raschke's transfer and reacquisition of his taxicab business appear to have been the subject of genuine confusion and the typical informality of business relations within a family. Taking all this into account, it cannot be said that the Raschkes demonstrated the lack of requisite good faith which would cause them to be denied confirmation of their chapter 13 plan.

Upon the foregoing, which constitutes my findings of fact and conclusions of law, it is ORDERED

That the amended chapter 13 plan of Charles W. Raschke and Elizabeth M. Raschke, as modified, be, and hereby is, confirmed.